















BJR    10/12/00    14:27

3:00-CV-02036    INTL LICENSING V. AZUREL LTD

*1*

*NTCREM.*

1 │ JOHN C. WYNNE (Bar No. 83041)
2 │ ROBERT L. KENNY (Bar No. 115858)
  │ DUCKOR SPRADLING & METZGER
  │ A Law Corporation
3 │ 401 West A Street, Suite 2400
  │ San Diego, CA 92101-7915
4 │ (619) 231-3666; (619) 231-6629 fax

FILED

00 OCT 11 PM 2: 26

CLERK ...
SOUTHERN ... OF CALIFORNIA

BY: B. Reed   DEPUTY

5 │ Attorneys for Defendant
  │ AZUREL LTD.

6

7

8               UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10                                    00 CV 2036 · L (RBB)

| | |
|---|---|
| INTERNATIONAL LICENSING (CALIFORNIA) CORP., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>AZUREL LTD., a New York corporation, and DOES 1-10, inclusive,<br><br>Defendant. | CASE NO.<br><br>Civil Action No:  GIC 754174<br><br>NOTICE OF REMOVAL OF CIVIL ACTION [28 USCS §§ 1441, 1446; FRCP 81(c)]<br><br>DEMAND FOR JURY TRIAL<br><br>Judge:      Hon. S. Charles Wickersham<br>Action Filed:  September 6, 2000 |

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF CALIFORNIA:

1.    Removing party, AZUREL LTD., is the defendant in the above-entitled action.

2.    On September 6, 2000, an action entitled *International Licensing (California) Corp. vs. Azurel Ltd.*, Case No. GIC 754174 (the "State Court Action") was commenced against removing party in the San Diego Superior Court, and is now pending therein.

3.    On September 11, 2000, removing party was served with a summons and complaint in the above-entitled action at 1633 Broadway, New York, New York 10019, by personal service in the State of New York.

4.    The parties in the State Court Action filed a stipulation extending the time to answer until October 27, 2000.  No further proceedings have been had in the state court.

ORIGINAL        CASE NO. _____

230483.1

1    5.    The amount in controversy in the above-entitled action, exclusive of interest and

2 costs, exceeds $75,000.

3    6.    Defendant AZUREL LTD. is a corporation incorporated in the State of Delaware,

4 with its principal place of business outside of the State of California.

5    7.    The above-entitled action is a civil action for damages for breach of contract and

6 common counts.

7    8.    This Court has original jurisdiction of the above-entitled action pursuant to 28 USC

8 section 1332 and the action may, therefore, be removed to this Court pursuant to 28 USC section

9 1441(a).

10    9.    Copies of the complaint and Stipulation to Extend Defendant's Time to Answer

11 Complaint are attached hereto as Exhibits 1 and 2.

12    10.    This notice is filed with this Court within 30 days after service on removing party

13 of the summons and/or complaint in the above-entitled action.

14    11.    Removing party is informed and believes that no other defendant has been served

15 with a copy of the summons and complaint in this action.

16    12.    By filing this Notice of Removal, the removing party does not waive any defenses

17 which may be available to it, specifically including, but not limited to, insufficient service of

18 process and the absence of jurisdiction or venue in this Court or the court from which this case has

19 been removed.

20    13.    AZUREL LTD. demands a trial by jury in this action.

21    WHEREFORE, removing party prays that the above-entitled action be removed from the

22 San Diego Superior Court to this Court.

23 DATED:  October 10, 2000                    DUCKOR SPRADLING & METZGER
                                                                        A Law Corporation

24

25

26                                                              By: _____

27                                                                    JOHN C. WYNNE
                                                                        ROBERT L. KENNY
28                                                                    Attorneys for Defendant
                                                                        AZUREL LTD.

- 2 -

CASE NO. _____

230483.1

Callie A. Bjurstrom, State Bar No. 137816
Michael L. Branch, State Bar No. 149561

600 West Broadway, Suite 2600
San Diego, CA 92101
Phone: (619) 236-1414
Fax: (619) 232-8311

Attorneys for Plaintiff
International Licensing (California) Corp.

F I L E D

? SEP 7 5 PM 1: 29

COURT
SAN DIEGO COUNTY, CA

9973 01 11 GIC754174  09/07/00 10:36
02 001 New Civil              $196.00

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| INTERNATIONAL LICENSING (CALIFORNIA) CORP., a California corporation,<br><br>  Plaintiff,<br><br>vs.<br><br>AZUREL LTD., a New York corporation, and DOES 1-10, inclusive,<br><br>  Defendants. | Case No.: GIC **754174**<br><br>COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT, COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF<br><br>Principal Demand: $887,086.33 |

Plaintiff International Licensing (California) Corp. ( "plaintiff" or "ILCC"), alleges and states as follows:

### I.

### JURISDICTION AND VENUE

1. This Court has jurisdiction and venue in this cause pursuant to California Code of Civil Procedure sections 395(a) and 395.5, and pursuant to a written agreement between the parties. ILCC further alleges that the breaches of the agreements alleged herein occurred in the County of San Diego. The total amount of damages sought in this action exceeds the jurisdictional minimum of this Court.

///

///

1

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT, COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

II.

<u>PARTIES</u>

2.      ILCC is a corporation organized and existing under the laws of the State of California. ILCC's principal place of business is in the County of San Diego, State of California.

3.      Upon information and belief, plaintiff alleges that defendant Azurel LTD. ("Azurel") is now and at all times mentioned herein was a corporation duly organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

4.      Does 1 through 10, inclusive, are fictitious names of defendants sued herein pursuant to section 474 of the Code of Civil Procedure. Each Doe defendant, and each specifically named defendant, is in some way liable and responsible for ILCC's damages. ILCC will seek leave of court to amend this Complaint when the true names of such defendants can be ascertained.

5.      ILCC is informed and believes and thereon alleges that at all times alleged herein, each of the defendants sued herein was the agent, representative and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency, representation and employment. Each defendant is in some way liable and responsible for ILCC's damages.

III.

<u>GENERAL ALLEGATIONS</u>

6.      ILCC manages the family of Hang Ten trademarks and has the right to terminate Hang Ten license agreements, to collect royalties, and to otherwise enforce the Hang Ten marks.

7.      On or about October 6, 1997, International Licensing Corporation ("ILC"), a Luxemburg corporation, and Azurel entered into a License Agreement, a copy of which is attached to the complaint as Exhibit "A" and incorporated by reference as though fully set forth herein. Pursuant to the License Agreement, ILC granted to Azurel a license to use certain Hang Ten trademarks and trade names (collectively "trademarks") owned by Hang Ten International in the design, manufacture, advertising, sale and promotion of cologne, sun care products, bath and shower gels, bath soap, shampoo, hair conditioner and massage oils. Pursuant to an assignment and assumption of certain licensing agreements, ILC assigned all rights and obligations as licensor of the License Agreement to plaintiff ILCC.

2

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT, COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1         8.     Pursuant to the License Agreement, Azurel's rights to use these trademarks extended

2    throughout the United States of America and its territories and possessions, including the

3    Commonwealth of Puerto Rico, Guam, all United States military bases worldwide, Canada and

4    Mexico.

5         9.     On or about April 22, 1999, ILC and Azurel executed a First Amendment to Hang

6    Ten License Agreement ("First Amendment"). All terms and provisions of the original License

7    Agreement remained in effect, except as expressly set forth in the First Amendment. The First

8    Amendment amended, among other things, the minimum royalty provision of the License

9    Agreement.   A copy of the First Amendment is attached to the complaint as Exhibit "B" and

10   incorporated by reference as though fully set forth herein.

11        10.     On or about July 24, 1999, ILC and Azurel executed a Second Amendment to Hang

12   Ten License Agreement ("Second Agreement"). All terms and provisions of the original License

13   Agreement and First Amendment remained in effect, except as expressly set forth in the License

14   Agreement and First Amendment. The Second Amendment amended, among other things, the

15   minimum royalty provision of the License Agreement and First Amendment. A copy of the

16   Second Amendment is attached to the Complaint as Exhibit "C" and incorporated by reference as

17   though fully set forth herein.

18        11.     Pursuant to the terms of the License Agreement, First Amendment thereto and

19   Second Amendment thereto, Azurel agreed to pay certain royalties for the rights granted to Azurel

20   as set forth in the License Agreement, First Amendment and Second Amendment. The schedule

21   for calculating royalty payments is set out in detail in Special Provisions 6 and 8 of the License

22   Agreement, Paragraph Nos. 2 and 3 of the First Amendment, and Paragraph Nos. 4 and 5 of the

23   Second Amendment.

24        12.     In or about October 1999, Azurel became delinquent in the payment of its royalties

25   and other obligations to ILCC. Despite ILCC's efforts to work with Azurel to bring its account

26   current, Azurel has failed to perform its obligations under the License Agreement and amendments

27   thereto and has failed to satisfy its royalty obligations to ILCC.

28   ///

3

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT,
COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## FIRST CAUSE OF ACTION

(Breach of Contract)

13.    ILCC hereby incorporates by reference the allegations contained in paragraphs 1 through 12 as though fully set forth herein.

14.    The schedule for calculating royalty payments is set out in detail in Special Provisions 6 and 8 of the License Agreement, Paragraph Nos. 2 and 3 of the First Amendment and Paragraphs Nos. 4 and 5 of the Second Amendment.  Pursuant to the terms of the License Agreement between ILC and Azurel, Azurel agreed to pay to ILCC as royalties for the rights granted under the License Agreement and amendments thereto, a minimum of $37,500 for the First Contract Year for the territorial area specified therein.  Pursuant to the terms of the First Amendment, Azurel agreed to pay to ILCC as royalties for the rights granted thereunder, a minimum of $20,250 for the First Contract Year for the territorial area specified therein.  Pursuant to the terms of the Second Amendment, Azurel agreed to pay to ILCC as royalties for the rights granted thereunder, a minimum of $25,000 for the First Contract Year for the territorial area specified therein.  The Minimum Royalty Payments for subsequent years are set forth in the License Agreement and amendments thereto.  Pursuant to the terms of the License Agreement and amendments thereto, the actual royalties paid by Azurel to ILCC on a monthly basis as required by Articles G.P.3 and S.P.6 of the License Agreement, are applied against Azurel's minimum royalty obligation.  As a result, Azurel is responsible only for the difference between actual royalties paid on net shipments and the cumulative minimum royalties due.  Minimum royalties are due and payable as set forth in the License Agreement and amendments thereto.

15.    On or about December 1, 1999, ILCC served notice on Azurel that it was in default on its payment obligations.  As set forth in the Notice of Default, Azurel was in arrears on royalty payments to ILCC in the amount of $26,438 and for past due payment of advertising in the amount of $22,248.75.  By this notice, ILCC demanded that Azurel remit the past due payments immediately.  Pursuant to the License Agreement and proper demand made, Azurel was required to cure its default.  Despite said notice, Azurel failed to pay its past due royalty and other obligations.

///

4

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT, COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

16.    On or about July 7, 2000, ILCC served a Second Notice of Default on Azurel. As set forth in the Second Notice of Default, Azurel was in arrears on its royalty and other payment obligations to ILCC in the amount of $98,898.75. ILCC demanded payment in full pursuant to the terms of the Agreement.

17.    Azurel has failed to remit the total amount of royalties and other obligations due and owing to ILCC as required pursuant to the terms of the License Agreement.

18.    At all times relevant hereto, ILCC was in compliance with the terms and conditions of the License Agreement and the amendments thereto.

19.    Azurel is in breach of its obligations under the License Agreement in that it failed to remit to ILCC the minimum royalties due pursuant to the License Agreement and amendments thereto. As of this date, Azurel owes and has not paid ILCC a total of $887,086.33 in past due royalties, other obligations and performance of the contract. Azurel's failure to pay to ILCC the sums due under the License Agreement and amendments thereto is a breach of its obligations to ILC.

20.    As a proximate result of Azurel's breach of the License Agreement, ILCC has suffered damages in an amount to be proven at trial. The amount of damages suffered by ILCC is in excess of the jurisdictional minimum of this Court.

SECOND CAUSE OF ACTION

(Writ of Attachment)

21.    ILCC realleges paragraphs 1 through 20 by reference as though fully set forth herein.

22.    ILCC seeks a writ of attachment to secure Azurel's non-exempt property.

23.    Azurel entered into the License Agreement described herein. Azurel is now in default.

24.    ILCC has valid claims against Azurel for breaching the contract as set forth above, and is likely to prevail on the merits of such claims.

25.    ILCC's claims against Azurel are for money and interest based on the License Agreement.

5

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT, COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1    26.    ILCC's claims against Azurel arise out of Azurel's conduct in a trade, business or

2    profession.

3    27.    ILCC's claims are of fixed or readily ascertainable amounts, not less than $500

4    against Azurel.

5    28.    ILCC's claims are commercial claims, and are not secured by real property.

6                            THIRD CAUSE OF ACTION

7                          (Common Count - Account Stated)

8    29.    ILCC realleges paragraphs 1 through 28 by reference as though fully set forth

9    herein.

10    30.    Within four years last past, an account was stated by and between plaintiff and

11    defendants wherein and whereby it was agreed that said defendants were indebted to plaintiff in the

12    sum of $98,898.75.  No part of said sum has been paid, and there is now due, owing and unpaid to

13    plaintiff from said defendants, the sum of at least $98,898.75, together with interest thereon at the

14    maximum legal rate from November 1999.

15                            FOURTH CAUSE OF ACTION

16                        (Common Count - Open Book Account)

17    31.    ILCC realleges paragraphs 1 through 28 by reference as though fully set forth

18    herein.

19    32.    Within four years last past, plaintiff furnished to defendants at their special

20    insistence and request, upon an open book account, services, property and rights of the aggregate

21    value exceeding $98,898.75.

22    33.    Part of said sum has been paid, and there is now due, owing and unpaid to plaintiff

23    from said defendants, on said open book account, the sum of at least $98,898.75, together with

24    interest thereon at the maximum legal rate from November 1999.

25    34.    Plaintiff alleges that this cause of action is an action on a contract based on an open

26    book account entered into on or after January 1, 1987, as defined in Civil Code Section 1717.5 and,

27    as such, is entitled to its reasonable attorney's fees as provided by said statute.

28    ///

6

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT,
COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment)

35.     ILCC realleges paragraphs 1 through 34 by reference as though fully set forth herein.

36.     Article G.P. 16 of the License Agreement provides, among other things, that the License Agreement may be terminated upon Azurel's failure to cure a default in the performance of any of Azurel's obligations as set forth in the License Agreement.

37.     An actual controversy has arisen and exists between ILCC and Azurel in that, pursuant to ILCC's rights under Article G.P. 16 of the License Agreement, on December 1, 1999 and July 7, 2000, ILCC notified Azurel of its default of the terms and conditions of the License Agreement for failing to make royalty payments required pursuant to the License Agreement and amendments thereto.  As a result of Azurel's failure to cure its defaults under the Agreement, ILCC is informed and believes and thereon alleges, that Azurel disputes the validity and effect of its obligations and duties pursuant to the License Agreement and amendments thereto.

38.     Accordingly, a declaratory judgment is both necessary and proper in order to determine the rights and responsibilities of Azurel and ILCC under the License Agreement.

## SIXTH CAUSE OF ACTION

### (Injunctive Relief)

39.     ILCC realleges paragraphs 1 through 38 by reference as though fully set forth herein.

40.     G.P.17 of the License Agreement specifically provides that upon Azurel's failure to comply with its obligations of the License Agreement, Azurel shall discontinue its use of the Hang Ten trademarks, and Azurel shall be deemed to have forfeited its sell-off rights under the Agreement.

41.     Azurel is in default of its obligations under the Agreement and has failed to cure said default following notice from ILCC.  Under Article G.P.17 of the Agreement, Azurel acknowledges that it is not entitled to sell any licensed goods and that if it does, ILC will suffer harm for which monetary damages are insufficient and injunctive relief is required.

7

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT, COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1    42.    As a result of Azurel's breaches and failures to comply with the License Agreement,

2  Azurel has no rights relative to the design, manufacture, advertising, sale or promotion of any

3  product bearing the Hang Ten marks. Azurel is further prohibited from holding itself out to the

4  public, tacitly or affirmatively, as a licensee of the Hang Ten trademarks.

5    43.    Azurel's failure to comply with the License Agreement and failure to honor its

6  obligations has caused and is continuing to cause irreparable injury to ILC in the form of, among

7  other things, injury to the goodwill associated with the Hang Ten trademarks and the unauthorized

8  use of the marks and related proprietary materials.

9    44.    ILCC is entitled to injunctive relief ordering that Azurel immediately cease using

10  the Hang Ten trademarks, ordering Azurel to comply with each of its obligations of the License

11  Agreement, prohibiting Azurel from holding itself out to the public as a licensee of the Hang Ten

12  trademarks, and prohibiting Azurel from obstructing, interfering with or infringing upon the

13  business of new licensee(s) of the Hang Ten trademarks and/or the business relationship shared by

14  ILCC and any new licensee(s) of the Hang Ten trademarks.

15    WHEREFORE, ILCC prays that it obtain a judgment against Azurel and defendants as follows:

16    ON THE FIRST CAUSE OF ACTION

17    1.    For compensatory damages in the amount of $887,086.33;

18    2.    For compensatory damages in an amount to be proven at trial;

19    ON THE SECOND CAUSE OF ACTION

20    1.    For a writ of attachment securing Azurel's non-exempt property in an amount up to

21  $887,086.33, and an amount to be proven at trial or a hearing on the writ of attachment;

22    ON THE THIRD AND FOURTH CAUSES OF ACTION

23    1.    For compensatory damages in the amount of at least $98,898.75 and in an amount

24  to be proven at trial;

25    ON THE FIFTH CAUSE OF ACTION

26    1.    For a judgment declaring that Azurel has filed to comply with its rights and

27  obligations under the License Agreement and amendments thereto and setting forth the respective

28  rights and obligations of ILCC and Azurel to each other, if any;

8

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT,
COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1        2.     For an order requiring Azurel to fulfill its obligations pursuant to the License

2    Agreement and amendments thereto and to deliver all labels, signs, prints, packages, wrappers,

3    receptacles, advertisements, circulars, point of purchase displays, brochures and marketing

4    materials of all types, and other items bearing or containing the Hang Ten name and/or trademarks

5    to ILCC for destruction;

6                    ON THE SIXTH CAUSE OF ACTION

7        1.     For preliminary and permanent injunctive relief ordering Azurel to fulfill its

8    obligations under the License Agreement and amendments thereto by:

9        a.     Assigning, transferring and transmitting to ILC any and all rights of Azurel in the

10            Hang Ten trademarks, including associated goodwill, and the designs and styles of

11            the Licensed Items to the extent said designs and/or styles contain or employ the

12            Hang Ten marks;

13       b.     Ceasing to manufacture any of the designs and/or styles or use the Hang Ten

14            trademarks in any manner;

15       c.     Ceasing to sell any of the designs and/or styles or use the Hang Ten trademarks in

16            any manner;

17       d.     Prohibiting Azurel from holding itself out to the public, tacitly or affirmatively, as a

18            licensee of the Hang Ten trademarks;

19       e.     Prohibiting Azurel from obstructing, interfering with or infringing upon the

20            business of new licensee(s) of the Hang Ten trademarks and/or the business

21            relationship shared by ILC and any new licensee(s) of the Hang Ten trademarks;

22       f.     Furnishing to ILCC a schedule of all inventory of Licensed Items in Azurel's

23            possession (constructive or otherwise); and

24       g.     Furnishing to ILCC within sixty (60) days after the effective date of the Court's

25            Order, evidence of compliance by Azurel with the foregoing obligations;

26   ///

27   ///

28   ///

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT,
COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

ON ALL CAUSES OF ACTION

1. For reasonable attorneys' fees and costs of suit;

2. For interest at the maximum legal rate on all sums awarded; and

3. For such other and further relief as this Court deems just and proper.

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: _____
Michael L. Branch
Attorneys for Plaintiff International
Licensing (California) Corp.

10

COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT, WRIT OF ATTACHMENT,
COMMON COUNTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

**EXHIBIT A**

## LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** is made and entered into as of ___Oct 6th___, 1997 by and between INTERNATIONAL LICENSING CORPORATION , a Luxembourg corporation ("Licensor"), whose address is 15, rue de la Chapelle, L-1325 Luxembourg, and AZUREL LTD., a New York corporation ("Licensee"), whose address is 509 Madison Avenue, Suite 804, New York, New York 10022, with reference to the following facts:

**WHEREAS** Licensor has been granted the rights to license and enter into agreements with third parties to utilize certain trademarks and tradenames owned by Hang Ten International ("HTI"), a California corporation, including the words "Hang Ten", designs showing bare footprints, and combinations thereof (all of the above shall be hereinafter referred to as the "Trademarks"); and

**WHEREAS** Licensee seeks a License from Licensor to design, manufacture, advertise, sell and promote the items listed in Appendix "A"; said item(s) hereinafter referred to as the "Licensed Items"; and

**WHEREAS** The parties hereto agree that Licensor shall grant to Licensee a license to use the Trademarks in the design, manufacture, advertising, sale and promotion of the Licensed Items, subject to each of the terms, provisions and conditions of the Special Provisions (the "S.P.'s") and General Provisions (the "G.P.'s") hereof. This Agreement consists of the S.P.'s and the G.P.'s, as said S.P.'s are set forth below, and as said G.P.'s are attached hereto and incorporated by reference as though fully set forth herein. (Whenever the term "Agreement" or "License Agreement" is used, it specifically includes both the S.P.'s and the G.P.'s). In case of a difference, conflict and/or discrepancy between the S.P.'s and G.P.'s, the S.P.'s shall control and prevail.

### NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

### SPECIAL PROVISIONS

**S.P. 1    GRANT OF LICENSE AND DESIGNATION OF LICENSED ITEMS:**

A)    Effective October 1, 1997 and subject to Paragraph B below, Licensor grants to Licensee, for the period hereinafter specified and upon the terms, provisions and conditions of this License Agreement, the exclusive right and license to use the Trademarks within the Territory as Territory is defined in Article S.P. 3, in the design, manufacture, advertising, sale and promotion of the Licensed Items. In the event of any question regarding the definition of products which Licensee may wish to produce pursuant to this Agreement, the final decision shall rest in the sole discretion of Licensor. The rights granted to Licensee herein are limited to use on or in connection with the Licensed Items and Licensee specifically agrees not to use the Trademarks or give consent to the use of any of them in any manner or on any product or item, except as set forth in this Agreement, without the prior written consent of Licensor, or in any manner inconsistent with Licensor's grant of rights to Licensee herein.

B)   Licensor reserves the exclusive right to use and license the Trademarks with respect to the Licensed Items for premiums, giveaways and promotional sales, sales solely within Hang Ten branded retail stores and for direct mail sales to retail consumers.

C)   Licensor represents that the Trademarks shall be registered for use on the Licensed Items in the United States and Licensor will, at its own expense, take whatever steps are necessary to register the Trademarks for use on the Licensed Items in the remainder of the Territory and in those countries to which the Territory is expanded. Licensor represents that it has no knowledge that the use of the Trademarks on the Licensed Items constitutes an infringement of another trademark anywhere in the Territory. If, at any time, during the term of the Agreement or renewal terms, Licensee is prevented from selling the Licensed Items in a portion of the Territory, then, in addition to whatever other remedies Licensee may have, Licensee shall be relieved of its obligations with regard to such country including its obligations to make Minimum Sales or to pay Minimum Royalties.

   **S.P. 2**   **PREVIOUS LICENSEE:**  Notwithstanding anything contained herein, Licensee specifically agrees that this exclusive right and license may be subject to a former third party licensee's prior disposition rights, as exemplified by Article G.P. 17 hereof, and acknowledges that its rights under this Agreement are subject thereto, and such disposition rights shall neither alter nor diminish Licensee's duties and obligations hereunder. Licensor represents that excluding Master Licensee Agreements, there are no other existing licenses for the Trademarks for the Licensed Items.

   **S.P. 3**   **GEOGRAPHIC AREA:**  The rights granted to Licensee hereunder may be exercised by Licensee only within the United States of America and its territories and possessions (including the Commonwealth of Puerto Rico, Guam and all U.S. military bases worldwide), Canada and Mexico, and shall be exclusive therein. The rights granted to Licensee for duty free distribution and in the countries of the Middle East which include Saudi Arabia, United Arab Emirates, Kuwait, Oman, Iran, Lebanon, Bahrain and Jordan, are limited to use on or in connection with the Licensed Items and Licensee specifically agrees not to use the Trademarks or give consent to the use of any of them in any manner or on any product or item, without the prior written consent of Licensor. In addition, Licensee shall have the worldwide right to sell to duty-free shops, including facilities of international airlines, international airports, cruise lines and duty-free shops at border crossings. (Licensee's "Territory" shall include the above-listed countries as well as the worldwide duty-free shops).  Upon Licensee's request, Licensor may, in its sole discretion, extend the areas in which Licensee may exercise said rights, but any extension shall, in each instance, be first evidenced by a written and duly executed amendment to this Agreement for such periods and upon such terms and conditions mutually acceptable to both Licensor and Licensee.  Licensor shall not offer a license of the Trademarks for use on the Licensed items in any location without offering said license first to Licensee, for a period of thirty (30) days. Notwithstanding the foregoing, Licensee agrees that it possesses no rights to and shall not sell the Licensed Items to exporters or others for resale or reshipment outside of the Territory.

   **S.P. 4**   **TERM:**  This Agreement shall consist of two separate terms. The first term shall be for a period commencing as of October 1, 1997 and ending March 31, 1999 (the "First Term"). The second term shall commence on January 1, 1999 and continue for five (5)

years and until December 31, 2003 unless sooner terminated or extended pursuant hereto (the "Second Term").

During the First Term Licensee shall distribute the Licensed Items exclusively to Hang Ten stores on the terms set forth in Paragraph S.P.15.

During the Second Term, each period from January 1 through December 31 is hereafter referred to as the "(sequential number) Contract Year", with the exception of the "First Contract Year" which shall be for the period January 1, 1999 through December 31, 1999; for example, the period from January 1, 2000 through December 31, 2000 shall be referred to herein as the "Second Contract Year" and so forth. When the term "Contract Year" is used, it shall mean each of the First Contract Year, the Second Contract Year, and so forth.

### S.P. 5      FAILURE TO MARKET:

**A)**    Notwithstanding the above grant of rights to Licensee, in the event that Licensee is not actively and substantially producing any of the separately denoted Licensed Item(s) by June 1, 1998, or fails to have such Item(s) available to the trade in commercially reasonable quantities during any ninety (90) day period thereafter (except seasonal items out of season), then Licensor, at its option, may terminate this Agreement with respect to such Licensed Item(s) upon giving thirty (30) days written notice to Licensee. If the Licensee has not cured this failure within that time (or commenced activities necessary to cure), Licensor shall be free to proceed with any third party for such Licensed Item(s). Notwithstanding any such termination as provided in this Paragraph, provided that Licensee is still producing one or more of the Licensed Items, the balance of this Agreement shall remain unaffected, Licensee's rights and obligations shall be exactly as provided in this Agreement, and there shall be no reduction or alteration of any Minimum Royalty or Minimum Net Shipment amount stated in this Agreement.

**B)**    In addition to the above requirement concerning marketing of the Licensed Items, in the event that Licensor requests Licensee to produce and market particular specimens of goods that Licensee is offering in other lines sold by Licensee, and Licensee declines to produce and market same, Licensor shall have the right to contract with any third party for production of the declined specimens, after thirty (30) days and shall further have the right to sell such items itself or through a third party. Licensee shall have fifteen (15) working days from the date of Licensor's solicitation to accept or decline Licensor's request as stated hereinabove.

### S.P. 6      ROYALTIES:  Licensee shall pay to Licensor as royalties for the rights

granted hereunder the greater of the Minimum Royalty set out in Article S.P. 8 or a sum equal to five percent (5%) of Licensee's actual Net Shipments of Licensed Items, as "Net Shipments" is defined in Article G.P. 1. provided however that no royalties shall be owed to Licensor for sales to the Hang Ten retail stores. Such royalties shall be paid and accounted for on a monthly basis in accordance with Article G.P. 3.

### S.P. 7      ADVANCE DEPOSIT:  Licensee shall pay to Licensor US$ 10,000 upon

signing by Licensee of this Agreement as an Advance Deposit to be applied against royalties due under Articles S.P. 6 and S.P. 8 during the First Contract Year.

**S.P. 8     MINIMUM ROYALTY:** Licensee shall pay a Minimum Royalty to Licensor as follows:

|  | United States | Canada | Mexico | Middle East/ Duty-Free | Total |
|---|---|---|---|---|---|
| First Contract Year (1999) | US$ 15,000 | 5,000 | 7,500 | 10,000 | 37,500 |
| Second Contract Year (2000) | US$ 30,000 | 10,000 | 15,000 | 20,000 | 75,000 |
| Third Contract Year (2001) | US$ 55,000 | 15,000 | 20,000 | 35,000 | 125,000 |
| Fourth Contract Year (2002) | US$ 67,500 | 17,500 | 22,500 | 42,500 | 150,000 |
| Fifth Contract Year (2003) | US$ 80,000 | 20,000 | 25,000 | 50,000 | 175,000 |

however, the Minimum Royalty for the Second Contract Year and each succeeding Contract Year shall be the amount stated above, or 75% of the preceding Contract Year's actual royalties due, whichever is greater.

The above Minimum Royalties shall be due and payable on or before the 20th day of the month following each Contract Year calendar quarter at the rate of 25% per quarter for each of the respective Contract Years. In the event actual royalties paid monthly are less than the quarterly minimums set forth above, Licensee will be responsible for the difference between actual royalties paid on Net Shipments and the cumulative Minimum Royalties due.

**S.P. 9     MINIMUM NET SHIPMENTS OF LICENSED ITEMS:** Notwithstanding anything to the contrary set forth herein, Licensee shall maintain Minimum Net Shipments as follows:

|  | United States | Canada | Mexico | Middle East/ Duty-Free | Total |
|---|---|---|---|---|---|
| First Contract Year (1999) | US$ 300,000 | 100,000 | 150,000 | 200,000 | 750,000 |
| Second Contract Year (2000) | US$ 600,000 | 200,000 | 300,000 | 400,000 | 1,500,000 |
| Third Contract Year (2001) | US$1,100,000 | 300,000 | 400,000 | 700,000 | 2,500,000 |
| Fourth Contract Year (2002) | US$1,350,000 | 350,000 | 450,000 | 850,000 | 3,000,000 |
| Fifth Contract Year (2003) | US$1,600,000 | 400,000 | 500,000 | 1,000,000 | 3,500,000 |

however, the Minimum Net Shipments for the Second Contract Year and each succeeding Contract Year shall be the amount stated above or 75% of the preceding Contract Year's actual Net Shipments for each respective country/category, whichever is greater.

If Licensee fails to maintain the required Minimum Net Shipments, Licensor may terminate this Agreement by written notice delivered to Licensee within six (6) months after the end of the Contract Year in which Licensee failed to maintain such required Minimum Net Shipments. Any such termination shall not affect Licensee's obligations to pay any amounts due to Licensor, arising or accruing prior to or as of the date of such termination including but not limited to a claim for the balance of Minimum Royalties, pro-rated to the date of termination. Licensee and Licensor shall have all of the rights and obligations set forth in G.P.17 regarding termination. Licensee shall not be permitted to cross-collateralize Net Shipments achieved in one country/category with Minimum Net Shipments in respect of any other country/category within the Territory.

S.P. 10     ADVERTISING REQUIREMENTS:

A)     In each Contract Year, Licensee shall expend at least a sum equal to the greater of two percent (2%) of Licensee's Minimum Net Shipments (as Minimum Net Shipments are defined at Article S.P. 9) or two percent (2%) of Licensee's actual Net Shipments (as "Net Shipments" is defined in Article G.P. 1) for that Contract Year for institutional advertising and promotion of the Licensed Items.  (Institutional advertising and promotion shall include trade and/or consumer media such as newspapers, magazines, television and/or radio, but does not include catalogues and brochures.)   Concurrently with the rendition of the annual report required by Article G.P. 4, Licensee shall submit a report certified as accurate by Licensee's Chief Financial Officer evidencing the performance of its financial obligation during the preceding Contract Year for such institutional advertising and promotion.  If said annual report shows that less than the required amount was spent, the difference between the amount actually spent and the amount to be spent must be remitted to Licensor within thirty (30) days for use in the Hang Ten Advertising and Promotion Program Pool.

B)     In addition to and separate from the institutional advertising requirement as set forth in Article S.P. 10(A), Licensee shall pay to Licensor for the Hang Ten Advertising and Promotion Program Pool (the "Ad Pool"), the greater of the "Minimum Ad Pool Fee" set forth below, or a sum equal to one percent (1%) of Licensee's actual Net Shipments (as Net Shipments is defined in Article G.P. 1).  Such actual Ad Pool fees shall be paid and accounted for on a monthly basis in accordance with Article G.P. 3.

The Minimum Ad Pool Fee shall be due and payable on or before the 20th day of the month following each Contract Year quarter at the rate of 25% per quarter for each of the respective Contract Year quarters.  The actual Ad Pool fees paid monthly will be applied against the quarterly minimums set forth below, and Licensee will be responsible only for the difference between actual Ad Pool fees paid on Net Shipments and the cumulative Minimum Ad Pool Fee due.

### Minimum Ad Pool Fee

|  | United States | Canada | Mexico | Middle East/ Duty-Free | Total |
|---|---|---|---|---|---|
| First Contract Year (1999) | US$ 3,000 | 1,000 | 1,500 | 2,000 | 7,500 |
| Second Contract Year (2000) | US$ 6,000 | 2,000 | 3,000 | 4,000 | 15,000 |
| Third Contract Year (2001) | US$ 11,000 | 3,000 | 4,000 | 7,000 | 25,000 |
| Fourth Contract Year (2002) | US$ 13,500 | 3,500 | 4,500 | 8,500 | 30,000 |
| Fifth Contract Year (2003) | US$ 16,000 | 4,000 | 5,000 | 10,000 | 35,000 |

C)     The payments required under both Paragraphs (A) and (B) of this Article S.P. 10 are separate from and in addition to Licensee's obligations to pay actual and Minimum Royalties under this Agreement, and may not be applied against or credited towards such royalty obligations.

D)     Licensee shall submit to Licensor for prior approval all advertising and promotional items, programs and materials relating to the Licensed Items at least twenty (20) days prior to media deadlines.  Licensor shall have the right to disapprove any proposed items which do not

meet Licensor's standard requirements as to image and character. Failure of Licensor to disapprove of same within fifteen (15) days after Licensor's receipt thereof shall constitute approval.

**S.P. 11**      **ADDRESS FOR NOTICES:**   All notices and other communications required under this Agreement shall be in writing and shall be personally delivered, sent by registered or certified mail, postage prepaid, return receipt requested, or sent by an overnight express courier service that provides written confirmation of delivery, to Licensee at its address as set forth above in the introductory Paragraph of this Agreement, and to Licensor at the following address:

International Licensing Corporation
15, Rue de la Chapelle
L-1325 Luxembourg

All items required under G.P. 11, and a copy of all notices and communications should be delivered to:

International Licensing (California) Corp.
3636 Nobel Drive
Suite 400
San Diego, CA 92122
Attention: Paul B. Epner, President

Each such notice or other communication shall be deemed given, delivered and received upon its actual receipt, except that if it is sent by mail in accordance with this Paragraph, then it shall be deemed given, delivered and received 144 hours after the date such notice or other communication is deposited with the United States Postal Service in accordance with this Paragraph. Any party to this Agreement may give notice of a change of its address to the other party to this Agreement.

**S.P. 12**      **TIME IS OF THE ESSENCE IN EXECUTION:** Licensee and Licensor acknowledge that time is of the essence with respect to the Licensor's and Licensee's execution and delivery to Licensor of this license agreement, which shall occur no later than October 15, 1997.

This license agreement shall have no force and effect unless and until signed by both Licensee and Licensor.

**S.P. 13**      **FISCAL YEAR:** Licensee's fiscal year is January to December.

**S.P. 14**      **PRODUCT DISTRIBUTION:**   Licensee      acknowledges      the marketing techniques and retailing standards of Licensor and agrees to maintain these standards to protect the value of the Trademarks and the image of the Licensed Items. Licensee shall maintain the same or higher standards for the selection of retail, wholesale and other outlets as those maintained by Licensor, namely those stores that are commonly referred to in the market as "up-market" stores. In the event of any question regarding the type of store or stores to which this requirement applies, Licensee shall first request Licensor's approval of a proposed store or

stores and the final decision regarding same shall be determined by Licensor. Licensee acknowledges that Licensor may change such standards from time to time during the term of this Agreement and that the changed standards shall apply to Licensee after reasonable notice thereof. Such changed standards shall not apply to stores in which the Licensed Items are already being sold or which Licensor has previously approved without been given a reasonable time frame to execute the change.

Licensor shall have the right, at any time, and from time to time, to disapprove of the sale of Licensee's Licensed Items to particular wholesale and/or retail outlets that were previously acceptable, including the right to disapprove of outlets that were previously acceptable. Unless prior written approval is obtained from Licensor, Licensee is specifically prohibited from the sale and distribution of the Licensed Items through (i) any disapproved outlets, and (ii) any factory outlet stores, warehouse sales, parking lot sales, swap meets, flea markets and similar sale or disposal techniques. Licensee's failure to comply with the requirements of this Article S.P. 14 shall constitute a material breach of this License Agreement and Licensor may, at its sole option, terminate Licensee's rights under this Agreement for failure to adhere to these retailing and marketing standards and/or obtain specific performance to enjoin any such actions or threatened actions by Licensee. Licensor's determination as to whether a retail outlet satisfies the criteria of this Article S.P. 14 shall be final and binding as between Licensee and Licensor.

## S.P. 15    DISTRIBUTION TO HANG TEN RETAIL STORES:

A)    Licensee agrees to offer the Licensed Items at ~~manufacturers~~ LICENSEES cost plus ten percent (10%) on F.O.B., New Jersey, to all  Hang Ten retail stores, owned, operated or franchised by Licensor or its affiliates including without limitation to those in the countries of Taiwan, Hong Kong, Macao, Singapore, Philippines, Indonesia, Thailand, Myanmar, China, Vietnam, Malaysia, India and Middle East countries which include Saudi Arabia, United Arab Emirates, Kuwait, Oman, Iran, Lebanon, Bahrain, Qatar, Syria, Egypt, Iraq and Jordan. Such Hang Ten store(s) shall have no obligation to purchase the Licensed Items unless it is reasonably satisfied with the quality, delivery and pricing terms associated therewith, failing which the Hang Ten store(s) shall have the right to purchase the Licensed Items from any third party of their choosing.

B)    Licensee may employ at its own expense a Master Distributor to merchandise the Licensed Items in the Hang Ten retail stores.

/
/
/
/
/
/
/
/
/
/
/

stores and the final decision regarding same shall be determined by Licensor. Licensee acknowledges that Licensor may change such standards from time to time during the term of this Agreement and that the changed standards shall apply to Licensee after reasonable notice thereof. Such changed standards shall not apply to stores in which the Licensed Items are already being sold or which Licensor has previously approved without been given a reasonable time frame to execute the change.

Licensor shall have the right, at any time, and from time to time, to disapprove of the sale of Licensee's Licensed Items to particular wholesale and/or retail outlets that were previously acceptable, including the right to disapprove of outlets that were previously acceptable. Unless prior written approval is obtained from Licensor, Licensee is specifically prohibited from the sale and distribution of the Licensed Items through (i) any disapproved outlets, and (ii) any factory outlet stores, warehouse sales, parking lot sales, swap meets, flea markets and similar sale or disposal techniques. Licensee's failure to comply with the requirements of this Article S.P. 14 shall constitute a material breach of this License Agreement and Licensor may, at its sole option, terminate Licensee's rights under this Agreement for failure to adhere to these retailing and marketing standards and/or obtain specific performance to enjoin any such actions or threatened actions by Licensee. Licensor's determination as to whether a retail outlet satisfies the criteria of this Article S.P. 14 shall be final and binding as between Licensee and Licensor.

**S.P. 15      DISTRIBUTION TO HANG TEN RETAIL STORES**

A)      Licensee agrees to offer the Licensed Items at ~~manufacturer's~~ LICENSEE'S cost plus ten percent (10%) on F.O.B., New Jersey, to all Hang Ten retail stores, owned, operated or franchised by Licensor or its affiliates including without limitation to those in the countries of Taiwan, Hong Kong, Macao, Singapore, Philippines, Indonesia, Thailand, Myanmar, China, Vietnam, Malaysia, India and Middle East countries which include Saudi Arabia, United Arab Emirates, Kuwait, Oman, Iran, Lebanon, Bahrain, Qatar, Syria, Egypt, Iraq and Jordan. Such Hang Ten store(s) shall have no obligation to purchase the Licensed Items unless it is reasonably satisfied with the quality, delivery and pricing terms associated therewith, failing which the Hang Ten store(s) shall have the right to purchase the Licensed Items from any third party of their choosing.

B)      Licensee may employ at its own expense a Master Distributor to merchandise the Licensed Items in the Hang Ten retail stores.

/
/
/
/
/
/
/
/
/
/
/

In witness whereof, the authorized officers of the parties hereto have executed this agreement as of the date set forth below.

**INTERNATIONAL LICENSING CORPORATION**
A Luxembourg corporation
("Licensor")

By: _____
    Kung Ging Kong, Dennis
    Director

Dated: _____


**AZUREL LTD.**
A New York corporation
("Licensee")

By _____
    Gerard Semhon
    Chief Executive Officer/Chairman

Dated _10_/_6_/_9 7_ _____

In witness whereof, the authorized officers of the parties hereto have executed this agreement as of the date set forth below.

INTERNATIONAL LICENSING CORPORATION
A Luxembourg corporation
("Licensor")

By: _____
    Kung Ging Kong, Dennis
    Director

Dated: _Oct. 9th, 1997._

AZUREL LTD.
A New York corporation
("Licensee")

By _____
    Gerard Semhon
    Chief Executive Officer/Chairman

Dated ____10/6/97____

## APPENDIX "A"

### Licensed Items

1.  Cologne
2.  Sun Care products
3.  Bath and Shower Gels
4.  Bath soap
5.  Shampoo
6.  Hair Conditioner
7.  Massage Oils

\*  The above products are included in International Class 3 in the international trademark classification system.  Licensee acknowledges that the Trademarks are not currently registered in International Class 3 in Canada, Mexico along with other markets where duty free sales may occur and Middle Eastern Countries covered by this Agreement.  Licensor will file new trademark applications on behalf of Hang Ten International in these territories upon execution of this Agreement.

## GENERAL PROVISIONS

THESE GENERAL PROVISIONS AND THE SPECIAL PROVISIONS TO WHICH THEY ARE ATTACHED CONSTITUTE THE LICENSE AGREEMENT BETWEEN INTERNATIONAL LICENSING CORPORATION ("LICENSOR"), AND AZUREL LTD. ("LICENSEE") DATED October 6, 1997 _____.

THESE GENERAL PROVISIONS ARE OF FULL FORCE AND EFFECT IN CONJUNCTION WITH THE SPECIAL PROVISIONS HEREOF, PROVIDED, HOWEVER, THAT IN THE EVENT ANY TERM HEREOF IS INCOMPATIBLE AND/OR AT VARIANCE AND/OR AMBIGUOUS WITH ANY TERM OR PROVISION OF THE SPECIAL PROVISIONS, THE SPECIAL PROVISIONS SHALL CONTROL AND PREVAIL.

G.P. 1      DEFINITION OF "NET SHIPMENTS": "Net Shipments" shall mean the invoice price charged by Licensee for Licensed Items sold and shipped by Licensee, less refunds, credits and allowances actually made or allowed to customers for returned Licensed Items.  In the event that Licensee sells to a related party of Licensee, the pricing structure for said sale shall be uniform for all licensees at a reasonable discounted price, excluding at least royalties, advertising, sales commission and discounts. Sales to Hang Ten retail stores shall not be included in Net Shipments for purposes of calculating royalties.

G.P. 2      LICENSEE'S RECORDS:  Licensee shall keep and maintain at its regular place of business, during the term of this Agreement and for twelve months thereafter, complete books and records of all business transacted by Licensee in connection with the Licensed Items, including but not limited to books and records relating to Net Shipments and orders for Licensed Items.  Such books and records shall be maintained in accordance with Generally Accepted Accounting Principles consistently applied.

G.P. 3      LICENSEE'S MONTHLY REPORTS OF SHIPMENTS; ROYALTY PAYMENTS:  On or before the 20th day of each month during the term hereof and any extension thereof, Licensee shall deliver to Licensor a written statement, certified to be true and correct by the Chief Financial Officer of Licensee setting forth the gross and Net Shipments by Licensee, itemized by category of Licensed Items, for each of the Licensed Items during the preceding calendar month.  Full payment of the amounts due under Articles S.P. 6, S.P. 8 and S.P. 10 hereof shall be wire transferred to Licensor's bank account as designated at Appendix "B" attached hereto.  In the event of shipments of Licensed Items prior to commencement of the term hereof, Licensee shall submit monthly reports and royalty payments as if the term had commenced on the date of the first such shipment.  If Licensee fails to pay any sum due hereunder within ten (10) days after its due date, the amount owing shall thereupon bear interest until paid at the rate of 18% with the amount of such interest calculated from such time as said amounts were initially due hereunder until they are actually paid.  In no event shall the interest rate charged exceed the maximum rate allowable under the relevant provisions of the laws of California and Licensee's domicile.

Concurrent with Licensee's delivery of the above-described monthly report, Licensee shall provide Licensor with a listing of all of Licensee's accounts and customers showing the completed Net Shipments of Licensed Items achieved by Licensee for each account and/or each customer for the previous shipment month. In addition, Licensee shall provide Licensor with a listing, by account, of all account/bookings (open order dollar volume) open at the time of the report.

G.P. 4    LICENSEE'S ANNUAL REPORTS AND ANNUAL ROYALTY PAYMENTS: On or before the 20th day of the third month following the end of Licensee's fiscal year, Licensee shall render to Licensor a written statement, certified by a certified public accountant, showing gross shipments, Net Shipments, royalties due and royalties paid for Licensee's preceding fiscal year, and for any Contract Year which ended within said fiscal year. If said statement discloses that the amount of royalties paid during any period to which said statement relates was less than the amount required to be paid, Licensee shall pay said deficiency concurrently with the delivery of the statement, together with interest at 18%, with the amount of such interest calculated from such time as said amounts were initially due hereunder until they are actually paid. In no event shall the interest rate charged exceed the maximum rate allowable under the relevant provisions of the laws of California and Licensee's domicile. If said statement discloses that Licensee has paid royalties in excess of the amounts required to be paid, Licensee shall be entitled to a credit equal to such excess royalties against the royalties next accruing under this Agreement. In the event of excess royalty payments during the final year of this Agreement, adjustments shall be made in cash rather than in the form of a credit.

G.P. 5    AUDIT BY LICENSOR: At all times during the existence of this Agreement and for twelve (12) months thereafter, Licensor, upon giving Licensee at least ten (10) days advance written notice of its intention so to do, shall have the right to inspect or audit all books and records which Licensee is required to maintain pursuant to Article G.P. 2 above. If any such audit shall disclose that Licensee has understated Net Shipments or underpaid royalties for any reporting period, Licensee, upon written demand, shall forthwith pay the amount, if any, by which the royalties owing exceed royalties paid, with additionally, interest at 18% from such time as said amounts were initially due. In the event that Licensee has understated Net Shipments in excess of 2% or underpaid royalties in excess of 2% of the amount due for any Contract Year, Licensee shall forthwith and upon written demand also pay all costs, fees and expenses incurred by Licensor in conducting such audit, including, without limitation, reasonable travel expenses. Should such audit disclose that the royalties paid exceed the royalties due, Licensee shall receive credit equal to such excess royalties against the same royalties next accruing, except that when such audit is conducted at the expiration of the Agreement, any excess royalty payments revealed by such audit will be remitted to Licensee within thirty (30) days thereafter.

G.P. 6    BEST EFFORTS OF LICENSEE: Licensee shall use its best efforts and skill to design, manufacture, advertise, sell and ship the Licensed Items and shall continuously and diligently during the term hereof produce an inventory of Licensed Items and procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing. A cessation of the above for a continuous period of ninety (90) days shall be grounds for termination, without prior notice. Licensor shall have the right to inspect Licensee's said

facilities during regular business hours, without prior notice. Licensor shall use reasonable efforts to make such inspection in the presence of a representative of Licensee.

G.P. 7       LICENSED ITEMS TO BE KEPT DISTINCTIVE:   Licensee shall consistently distinguish the Licensed Items from other products manufactured and sold by Licensee and shall avoid confusing similarity between such the packaging of other products and that of the Licensed Items. Licensee shall take such efforts as are necessary to maintain the Licensed Items as separate and distinct lines in styling, design and merchandising from any other product manufactured or sold by Licensee. Licensor agrees to render reasonable assistance and advice to Licensee concerning style trends and direction. In the event Licensor shall create any design or style and submit the same for use by Licensee, Licensee shall not be required to use it, but regardless of Licensee's election, Licensee shall have no right to such design or style and shall not use it in connection with any product or service other than Licensed Items.

G.P. 8       ADDITIONAL OBLIGATIONS OF LICENSEE AS TO QUALITY, MERCHANDISING AND OTHER ASPECTS OF LICENSED ITEMS:

A)      Licensee shall provide and maintain at its sole cost and expense adequate facilities and qualified personnel to assure and perpetuate the quality of the Licensed Items consistent with the type, style and price range thereof. Licensee's accounting records of sales, shipments and returns of Licensed Items shall be maintained separately from Licensee's accounting records relating to other items manufactured or sold by Licensee.

B)      Licensee shall similarly furnish to Licensor, without request, prior to sale or shipment of such items, samples of each proposed new and/or introductory specimen to be utilized so as to insure the consistent high quality of the image and character of the Licensed Items. Licensor shall have the right to disapprove any proposed new sample which does not meet Licensor's standard requirements as to image, quality and character, but failure of Licensor to notify Licensee of such disapproval within fourteen (14) days after receipt of the sample shall constitute Licensor's disapproval.

C)      Licensee shall maintain distinctive advertising, design, styling and merchandising for the Licensed Items. Upon request, Licensee, at its sole cost, shall furnish to Licensor photographs and negatives of each previously approved product samples and finished production samples of Licensed Items for Licensor's further approval as to styling, materials and manufacturing quality. Licensor shall not arbitrarily or unreasonably withhold said approval.

D)      In addition thereto, prior to submission of such samples to Licensor, Licensee shall conduct normal tests and verification procedures on each such sample to assure that the quality of the Licensed Items are at least equal to the quality of similar competitive non-licensed items manufactured and sold at retail at comparable prices. In the event that Licensed Items are wearing apparel, Licensee shall further conduct tests relating to color fastness, maximum shrinkage, burst strength, curing and the like.

E)      Each Licensed Item shall contain thereon at least one representation of the Trademarks. All representations of the Trademarks placed upon any Licensed Item shall be either

embroidered, knitted, screenprinted or flocked thereon unless Licensor gives its prior written consent to some alternate method. Licensor specifically reserves the right to withhold approval as to any representation of any of the Trademarks on the Licensed Items, including without limitation any hang tags, labeling or packaging thereof, which does not conform to Licensor's standard requirements regarding uniformity as to such Trademark.

G.P. 9      RESTRICTIONS UPON SUBCONTRACTS:   Licensee shall have the right to enter into subcontracts for the manufacture of Licensed Items; provided, however that Licensee shall first ascertain to its satisfaction that each subcontractor is able to meet Licensee's quality standards and delivery schedules. In any event, Licensee shall not permit any subcontractor to further subcontract the work contracted for and shall discontinue using any subcontractor who shall consistently fail to comply with the required quality standards and/or delivery schedules.

G.P. 10      LICENSOR - LICENSEE MEETINGS:   Licensor shall have the right to call meetings to be held at Licensor's primary place of business not more frequently than once a year, with at least thirty (30) days advance written notice to Licensee. Such meeting shall be called to generally review matters relating to the terms and conditions of this Agreement and the compliance of each of the parties herewith, and to consider policies, planning and performance relating to quality controls, production, marketing, advertising and promotion of the Licensed Items and any other matter or matters of concern. In addition thereto, any party shall have the right to call meetings, as necessary, with at least thirty (30) days advance written notice to the other party to discuss and resolve specific matters of concern as they occur. If such meeting requires the attendance of Licensor then it should be held at Licensor's primary place of business. All meetings shall be attended by the representatives of the parties who are responsible for the performance as to those matters to be discussed and the costs thereof shall be borne by the respective parties. In addition, Licensor holds an annual Licensee convention and it is intended that the convention shall, among other things, foster cooperative projects among licensees, resolve outstanding business matters and provide an opportunity to review current licensee product and advertising. Due to the importance of this convention, Licensor expects Licensee to use its best efforts to have its representative(s) attend and participate.

G.P. 11      SAMPLES, PROMOTIONAL MATERIALS AND ACCOUNT LISTS:

A)     Upon completion of same, Licensee shall make available to Licensor the following:

1)     Current representative samples of all Licensed Items as well as findings, as Licensor or any other licensee may reasonably designate. Licensor, or any other licensee shall pay Licensee's normal salesperson's sample charges for said Licensed Items. Samples provided to Licensor for quality and design approval in accordance with the requirements set forth below shall be provided without cost to Licensor.

2)     Copies of Licensee's advertising, sales and promotional materials when the material is developed and available. Licensee shall keep a reasonable supply of such materials in stock to facilitate requests.

3)   Two (2) complete sample lines, at the same time as sample lines are provided to licensee's sales force, at the same price that Licensee charges its salespeople.

Licensee shall furnish the items specified in Article G.P. 11 (A) 1), 2) and 3) within seven (7) days after said items first become available to Licensee's sales representatives.

B)   Licensee acknowledges that providing the above items to Licensor and/or other licensees is of the essence of this Agreement and the recipient of any such items shall be free to incorporate any features or otherwise, in the manufacture of Licensed Items under other license agreements with Licensor; provided, however, that nothing herein shall be construed to alter and/or diminish the exclusive license granted Licensee hereby.

G.P. 12   <u>PROHIBITION OF ASSIGNMENTS AND TRANSFERS:</u> Without the prior written consent of Licensor, Licensee shall not voluntarily, involuntarily or by operation of law assign or transfer this Agreement or any of Licensee's rights or duties hereunder (except as specifically provided herein) or any interest of Licensee herein, nor shall Licensee enter into any sublicense for the use of the Trademarks by others. Further, without the prior written consent of Licensor, Licensee shall not sell or otherwise transmit or transfer to any party engaged in the design or manufacture of items similar to any of the Licensed Items, any design, style, know-how, technology or other item or knowledge of a technical or competitive nature furnished to Licensee by or through Licensor. Included within the prohibitions set forth herein are: (1) any transfer of any interest of Licensee under this Agreement to any entity in which the present controlling shareholders of Licensee do not have voting control, and (2) any transfer to any other party or parties of voting control of Licensee by its present controlling shareholders. Licensor shall not arbitrarily or unreasonably withhold its consent to any assignment or transfer of ownership or control of Licensee. It shall not be arbitrary or unreasonable for the Licensor to withhold its consent to an assignment or transfer made without its prior permission, even though if its permission had been sought it would have been arbitrary or unreasonable not to grant it. The consent of Licensor to one assignment, transfer or sublicense shall not be deemed to be consent to any subsequent assignment, transfer or sublicense. Any assignment, transfer or sublicense without Licensor's written consent shall be void and at the option of the Licensor shall constitute a default hereunder.

G.P. 13   <u>NO DILUTION OF TRADEMARKS NO ATTACK UPON TRADE-MARKS:</u>

A)   Licensee shall not at any time use, promote, advertise, display or otherwise publish any of the Trademarks or any material utilizing or reproducing any of them in whole or in part, in such a manner as may adversely affect any of Licensor's rights therein.

B)   Licensee shall cause to appear on all Licensed Items and on all materials on or in connection with which any of the Trademarks are used, such legends, markings and notices as may be required by law to give appropriate notice of all trademark, tradename or other rights therein or pertaining thereto.

C)   Licensee shall not contest the validity of the Trademarks or any rights of Licensor therein, nor will Licensee willingly become an adverse party to litigation in which others shall

contest the Trademarks or Licensor's said rights. In addition thereto, Licensee shall not in any way seek to avoid its obligations hereunder because of the assertion or allegation by any person(s) or government(s) that the Trademarks or any of them are invalid or by reason of any contest concerning the rights of Licensor therein.

D) Licensor shall file all applications and documents necessary to maintain its exclusive ownership of the Trademark for use on the Products in the Territory during the term of this Agreement and all renewal terms.

### G.P. 14   INFRINGEMENT AND OTHER TRADEMARK LITIGATION:

A) Licensee shall apprise Licensor as soon as practicable of any possible infringement of the Trademarks which comes to the attention of Licensee. Licensor at its sole cost and expense, and in its own name, shall prosecute and defend any action or proceeding which Licensor deems necessary or desirable to protect the Trademarks, including but not limited to actions or proceedings involving their infringement. Upon written request by Licensor, Licensee shall join Licensor at Licensor's sole cost in any such action or proceeding. In no event shall Licensee commence any action or proceeding to protect the Trademarks or any action or proceeding alleging infringement thereof without the prior written consent of Licensor. In addition, Licensee shall not unilaterally defend any infringement action unless it shall first make written demand upon Licensor so to do, and Licensor shall fail to do so in a timely manner. Any and all damages recovered in any action or proceeding commenced by Licensor shall belong solely and exclusively to Licensor. Notwithstanding the foregoing, Licensee may prosecute and defend, at its sole cost and expense, and in its own name, any action or proceeding to protect its designs or styles, provided, however, that, in connection therewith, Licensee shall indemnify and hold Licensor harmless from any liability (including attorney's fees and costs of defense) arising from any such action or proceeding, or from Licensee's creation or use of its designs or styles.

B) Licensor shall indemnify and hold Licensee harmless from any damage, cost or liability arising solely from Licensee's use of the Trademarks as authorized herein. Licensor shall not have any such obligation with regard to damages, costs or liabilities allegedly or actually arising, in whole or in part, from any other causes, including violations of laws and statutes governing antitrust regulation, trade regulation or unfair competition. Further, in the event of any threatened or actual action or proceeding in which they are or may be charged with jointly violating any antitrust, trade regulation or similar statute, Licensee may, at its option, choose to be represented in such threatened or actual action or proceeding by Licensor's counsel at no cost to Licensee for fees, costs or expenses. Licensor shall maintain full control of such threatened or actual action or proceeding and such representation of Licensee shall continue only so long as Licensor's counsel, in its sole discretion, is of the opinion that it may properly and ethically represent both Licensor and Licensee. Thereafter, Licensor's counsel shall continue to represent only Licensor and Licensee's continued defense shall be at its expense with separate counsel. Licensee shall, in a timely manner, execute and deliver to Licensor any pleading or other document necessary to carry out such change in legal representation.

C) Other than as expressly set forth in this Article G.P. 14, Licensee shall have no rights against Licensor with respect to any of the matters covered in this Article G.P. 14. Licensee shall

under no circumstances incur legal expenses on Licensor's account without first obtaining Licensor's specific written authorization.

G.P. 15    ADDITIONAL RESTRICTIONS UPON USE OF TRADEMARKS:
Licensee shall not use or permit the use on any of the Licensed Items, or on any carton, container or packaging which is received by the general public (as opposed to retailers), any tag, label, sticker, or other mark or identification which includes with any of the Trademarks, including the name "Hang Ten", the name of Licensee or of any other person, firm or entity (e.g., "Hang Ten by Licensee") nor shall Licensee include or permit the inclusion, with the name "Hang Ten" or any of the other Trademarks, in any advertising or promotional material featuring any of the Licensed Items which is disseminated to the general public (as opposed to trade advertising) the name of Licensee or of any other person, firm or entity. In addition to the foregoing, Licensee shall not use or permit the use of any of the Trademarks, including the name "Hang Ten", on or in connection with any product or service, other than the Licensed Items, which are manufactured or sold by Licensee, or which is licensed by Licensee to others for manufacture or sale (e.g., "Licensed by the makers of Hang Ten"), nor shall any of the Trademarks be used as part of the company name of Licensee. It is the intention of the parties hereto and the purpose of this Article G.P. 15 that all of the Licensed Items, and only the Licensed Items, be identified to the general public solely by one or more of the Trademarks. Licensee also agrees to use a registration indicator in the form of a circle - R symbol (or any alternative indicator complying with the trademark laws of the country(s) in which Licensee uses the marks) in conjunction with the Trademarks, except that the registration indicator may be omitted from the trademarks where the marks are used as design elements on the Licensed Items. However, all labels and hang tags shall include the registration indicator.

G.P. 16    DEFAULTS BY LICENSEE:
A)    Except as otherwise expressly provided in this Agreement, i) in the event Licensee shall default in the performance of any of the terms, obligations and conditions on the part of Licensee to be performed hereunder, and if such default involves the payment of money and the same shall not be cured within ten (10) days after Licensee's receipt of written notice, or if such default involves performance other than the payment of money and same shall not be cured within thirty (30) days after Licensee's receipt of written notice, or ii) if a Receiver is appointed to, or one or more creditors do take possession of all or substantially all of the assets of Licensee, or iii) if Licensee shall make a general assignment for the benefit of creditors, or iv) if any action is taken or suffered by Licensee under any insolvency or bankruptcy act; then, and in any one or more of such events, and in addition to any other rights which Licensor may have under this Agreement or at law or in equity, Licensor may immediately and without prior notice cancel and terminate this Agreement. In the event Licensee commits three or more defaults and corrections thereof of any nature during the term hereof and any extension, of which Licensor has given written notice, Licensor, in addition to its other rights hereunder and at law or in equity, may immediately and without prior notice, cancel and terminate this Agreement. The time for performance of any act required of either party shall be extended by a period equal to the period during which such party was actually prevented from performance by fire, flood, storm or other like casualty.

B)    The termination of this Agreement for any reason shall not relieve Licensee of any accrued obligations to Licensor, nor shall such action relieve Licensee of any obligation or duty

which, but for the termination of this Agreement, would have otherwise arisen under this Agreement, including without limitation, the obligation to pay Minimum Royalties for any Contract Years subsequent to the date of such termination.

G.P. 17   DISPOSAL OF INVENTORY OF LICENSED ITEMS UPON TERMINATION OF LICENSE AGREEMENT:   Immediately upon the Termination or Cancellation of this License Agreement, for any reason whatsoever, Licensee shall discontinue its use of the Trademarks in connection with the design, manufacture and sale of the Licensed Items and Licensee shall no longer have the right to use the Trademarks in any form or manner.

Licensor shall have a right of first refusal to purchase all finished goods and goods in progress (in production or on order) in the possession of Licensee at a price equal to the average wholesale price received by Licensee in the prior six (6) months for said goods. Licensor shall have fifteen (15) days from Licensor's receipt of a complete list of such inventory (itemized by style, size and color) of Licensed Items to be disposed of (including the applicable costs for same), in which to exercise said right of first refusal. In the event Licensor declines to exercise its right of first refusal within the stated time period, and if Licensee has fully complied with the terms of this Agreement, including the payment of all monies due to Licensor, Licensee shall have ninety (90) days from the date of Termination or Cancellation of this License Agreement to dispose of its inventory of Licensed Items, provided however, that said disposal shall be through approved outlets acceptable to Licensor, in accordance with the terms and conditions stipulated in Article S.P. 15 hereof. If any of the Licensed Items remain unsold after the expiration of the ninety (90) day disposal period, Licensee shall then remove from the Licensed Items all identification of the trademarks, including but not limited to any labels, hang tags, wrappers and packaging on which the Trademarks appear, before they are further sold or distributed. Any unsold Licensed Items upon which the trademarks cannot be removed shall be destroyed by Licensee. Such destruction shall be attested to in a certificate signed by an independent third party, approved by Licensor, and delivered forthwith to Licensor. In the event that this Agreement was terminated by Licensor for cause, Licensor shall have the right to purchase the remaining goods at Licensee's cost with all other provisions of this paragraph remaining the same. Licensee agrees that any sales of Licensed Items following any termination for cause will cause Licensor undue harm for which monetary damages will not suffice, and Licensor shall be entitled to seek and obtain injunctive relief prohibiting Licensee from selling any Licensed Items following such termination.

Licensee shall continue to abide by the terms of this Agreement with respect to such Licensed Items during the period that they are being disposed of as aforesaid, including without limitation, the payment of all royalties and fees in connection therewith. Neither Licensee nor any creditor (judgment or otherwise), assignee, transferee, trustee, or receiver of Licensee, or similar person or officer, or purchaser other than in the regular course of Licensee's business, may sell or transfer any of the Licensed Items until and unless all sums due Licensor from Licensee have been paid.

G.P. 18   ADDITIONAL RIGHTS UPON TERMINATION:   During the final Contract Year of the Term hereof or of any extension thereof, Licensor shall have the right to design, manufacture, and sell merchandise of the types covered by this Agreement and to

negotiate and conclude such agreements as it desires pursuant to which it may grant licenses to any party or parties of any of the rights herein granted to Licensee, except that no merchandise herein identified as Licensed Items shall be shipped by Licensor, or any third party other than Licensee, prior to the expiration or termination of this Agreement (exclusive of the additional six (6) month period for the disposition of the Licensed Items), but any successor Licensee may at all times solicit orders for shipment subsequent to the final Contract Year or any extension hereof.

G.P. 19    GOOD WILL: Licensee acknowledges that the Trademarks have acquired a valuable secondary meaning and good will. Accordingly, Licensee shall not use the Trademarks in any manner whatsoever which, directly or indirectly, might derogate or detract from their secondary meaning or good will. Except as may be otherwise specified in this Agreement, Licensee shall not use any of the Trademarks or any name or symbol confusingly similar thereto as part of its company name or symbol or as part of the name or symbol of any company which it controls or which is affiliated with it.

G.P. 20    INSURANCE: Licensee and its subcontractors and sublicensees, if any, shall carry product liability insurance with respect to the Licensed Items with a limit of liability of not less than US$1,000,000, and Licensor, its agents and affiliated companies shall be named therein as coinsured. Such insurance may be obtained in conjunction with a policy of product liability insurance which covers products other than the Licensed Items and shall provide for at least ten (10) days prior written notice to Licensor of the cancellation or substantial modification thereof. Licensee shall deliver to Licensor a certificate evidencing the existence of such insurance policies promptly after their issuance. Licensee hereby agrees to provide Licensor a copy of said insurance policy within sixty (60) days from the effective date of the License Agreement.

G.P. 21    BROKERS: Each of the parties hereby represents and warrants to the other that it has not employed or dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby and agrees to indemnify the other and hold it harmless from any and all liabilities including, without limitation, reasonable attorney's fees and disbursements paid or incurred in connection with any such liabilities for any claimed brokerage commissions or finders' fees in connection with this Agreement or the transactions contemplated hereby.

G.P. 22    RESERVED RIGHTS; OWNERSHIP: Rights not herein specifically and expressly granted to Licensee herein are reserved by Licensor and may be used by Licensor without limitation. Any use by Licensor of such reserved rights, including but not limited to the use or authorization of the use of the Trademarks in any manner whatsoever not inconsistent with Licensee's rights hereunder, shall not be deemed to be interference with or infringement of any of Licensee's rights, nor a breach of this Agreement. Licensee agrees that it does not and shall not possess any right, title or interest in the Trademarks, except the right to use the Trademarks in accordance with the terms and conditions of this Agreement, and that the Trademarks are and shall be the sole property of Licensor.

G.P. 23     ATTORNEY'S FEES; SITUS OF ACTIONS; APPLICABLE LAW: In the event any party hereto shall commence any action or proceeding against the other by reason of any breach or claimed breach in the performance of any of the terms or conditions of this Agreement, or to seek a judicial declaration of rights hereunder, the prevailing party in such action or proceeding shall be entitled to reasonable attorney's fees to be fixed by the trial court. This License Agreement shall be governed by, and construed in accordance with, the laws of the State of California. It is further agreed that this License Agreement is deemed to be consummated in the State of California and the forum for any dispute shall be the Federal Courts located in the State of California whose jurisdiction is the County of San Diego or the Superior Court of California for the County of San Diego, whichever is appropriate.

G.P. 24     NON-AGENCY OF PARTIES: This Agreement does not constitute Licensee as the agent or legal representative of Licensor, or Licensor as the agent or legal representative of Licensee, for any purpose whatsoever. Licensee is not granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of Licensor or to bind Licensor in any manner or thing whatsoever; nor is Licensor granted any right to authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of Licensee or to bind Licensee in any manner or thing whatsoever. No joint venture or partnership between the parties hereto is intended or shall be inferred.

G.P. 25     WAIVER BY LICENSOR: In the event Licensor shall at any time waive any of its rights under this Agreement or the performance by Licensee of any of its obligations hereunder, such waiver shall not be construed as a continuing waiver of the same rights or obligations, or a waiver of any other rights or obligations, and no waiver shall be effective unless made in writing by Licensor.

G.P. 26     INTEGRATED AGREEMENT: This Agreement (both S.P.'s and G.P.'s) constitutes the entire agreement between the parties as to the subject matter hereof and supersedes and replaces all prior understandings between the parties. No modifications, amendments or revisions hereof shall be of any force or effect unless the same are in writing and executed by the parties hereto. No officer, employee or representative of Licensor has any authority to make any representation or promise in connection with this Agreement or the subject matter hereof which is not contained herein; and Licensee agrees that it has not executed this Agreement in reliance upon any such representation or promise.

G.P. 27     SEVERABILITY OF PROVISIONS: Any provisions of this Agreement which shall be finally determined invalid shall be ineffective but such invalidity shall not affect the remaining provisions hereof. The titles to the Articles hereof are for convenience only and have no substantive effect.

G.P. 28     BINDING UPON SUCCESSORS: This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Article shall not be construed to alter or modify the prohibitions upon assignments or transfers by Licensee expressed elsewhere in this Agreement.

####

# Report of Net Shipments and Royalty Payments

Company Name: _____

Trademark: _____     Territory: _____

Wire Ref. No.: _____

Account No. _____     Category: _____

_____ | _____ | _____
Year | Month | Account No.

## Calculation of Year-to-Date Actual Net Royalty and Advertising Pool

| Reporting Period | Gross Shipments | Adjustments to Gross Shipments | Net Shipments | Royalty Rate | Actual Net Royalty | Withholding Tax Rate | Withholding Tax Amount | Actual Net Royalty USD Amount | % Ad Pool Rate | Actual Ad Pool Amount USD |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | A | | | D | | |

Year-to-Date Actual Net Royalty and Ad Pool as of the End of the Previous Reporting Period — B — E

Year-to-Date Actual Net Royalty (A + B) and Advertising Pool (D + E) — C

## Calculation of Year-to-Date Minimum Net Royalty and Advertising Pool

| | | | | | Minimum Net Royalty USD Amount | | Withholding | Minimum Net Royalty USD | | Annual Minimum Ad Pool | Minimum Ad Pool Amount USD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | G | | | | | | H |

Year-to-Date Minimum Guarantees

## Calculation of Net Royalty and Advertising Pool Due and Amount Paid

Greater of Year-to-Date Actual Net Royalty or Year-to-Date Minimum Net Royalty (C or G)

Greater of Year-to-Date Actual Advertising Pool or Year-to-Date Minimum Advertising Pool (F or H)

Less: Payments Previously Made on Year-to-Date Net Royalty and Year-to-Date Advertising Pool

Year-to-Date Net Royalty and Advertising Pool Due

Other Adjustments (Please Provide Explanation)

Amount Paid

Please Wire Transfer Payment to:
ABA#:121000358  Account#:13619-02403
International Licensing Corporation, S.A.
Bank of America, NT & SA
450 "B" Street, Suite 1700
San Diego, California 92101-8001

For Office Use Only

Payment Received: _____     Wire Number: _____

Amount Received: _____     Recorded By: _____

**EXHIBIT B**

# FIRST AMENDMENT TO HANG TEN LICENSE AGREEMENT

AZUREL LTD. ("Licensee") and INTERNATIONAL LICENSING CORPORATION ("Licensor") do hereby amend Licensee's Hang Ten License Agreement dated October 1, 1997 regarding the use of the words "Hang Ten" and associated trademarks in conjunction with certain products therein generally described as the "Licensed Items". The term "License Agreement" means and includes the initial License Agreement and all Amendments thereto. (All capitalized terms shall have the same meaning as in the License Agreement.)

All terms and provisions of the License Agreement, shall remain the same and applicable to this First Amendment, except as otherwise expressly set forth herein:

NO. 1  ADDITIONAL TERRITORIES:  Effective March 1, 1999, the Territory as set forth in the License Agreement shall be amended to include the countries of:

| ASIA/PACIFIC | EUROPE | LATIN AMERICA |
|---|---|---|
| Australia | Austria | Argentina |
| China | Benelux | Brazil |
| South Korea | Denmark | Chile |
| Taiwan | France | |
| | Germany | |
| | Italy | |
| | Norway | |
| | Sweden | |
| | Switzerland | |

NO.2  MINIMUM ROYALTY: Licensee shall pay to Licensor as royalties for the rights granted hereunder the greater of the Minimum Royalty set out in Article No.3 hereinbelow, or a sum equal to five percent (5%) of Licensee's actual Net Shipments of Licensed Items, as "Net Shipments" is defined in Article G.P. 1 of the underlying License Agreement. Such royalties shall be paid and accounted for on a monthly basis in accordance with Article G.P. 3 of the Agreement.

NO.3  ROYALTIES:  Licensee shall pay a Minimum Royalty to Licensor for the Additional Territories as follows:

TOTALS:

| | | |
|---|---|---|
| First | Contract Year (1999) | $ 20,250 |
| Second | Contract Year (2000) | $ 31,000 |
| Third | Contract Year (2001) | $ 55,000 |
| Fourth | Contract Year (2002) | $ 67,500 |
| Fifth | Contract Year (2003) | $ 80,000 |

BREAK DOWN:

|  | | ASIA/PACIFIC | EUROPE | LATIN AMERICA |
|---|---|---|---|---|
| First | Contract Year (1999) | $13,750 | $4,000 | $2,500 |
| Second | Contract Year (2000) | $20,000 | $6,000 | $5,000 |
| Third | Contract Year (2001) | $35,000 | $12,500 | $7,500 |
| Fourth | Contract Year (2002) | $42,500 | $15,000 | $10,000 |
| Fifth | Contract Year (2003) | $50,000 | $17,500 | $12,500 |

The above Minimum Royalties shall be due and payable on or before the 20th day of the month following each Contract Year calendar quarter at the rate of 25% per quarter for each of the respective Contract Years. In the event actual royalties paid monthly are less than the quarterly minimums set forth above, Licensee will be responsible for the difference between actual royalties paid on Net Shipments and the cumulative Minimum Royalties due.

NO. 2      MINIMUM NET SHIPMENTS: The Minimum Net Shipments for the Additional Territories shall be as follows:

TOTALS:

| First | Contract Year (1999) | $405,000 |
|---|---|---|
| Second | Contract Year (2000) | $620,000 |
| Third | Contract Year (2001) | $1,100,000 |
| Fourth | Contract Year (2002) | $1,350,000 |
| Fifth | Contract Year (2003) | $1,600,000 |

BREAK DOWN:

|  | | ASIA/PACIFIC | EUROPE | LATIN AMERICA |
|---|---|---|---|---|
| First | Contract Year (1999) | $275,000 | $80,000 | $50,000 |
| Second | Contract Year (2000) | $400,000 | $120,000 | $100,000 |
| Third | Contract Year (2001) | $700,000 | $250,000 | $150,000 |
| Fourth | Contract Year (2002) | $850,000 | $300,000 | $200,000 |
| Fifth | Contract Year (2003) | $1,000,000 | $350,000 | $250,000 |

If Licensee fails to maintain the required Minimum Net Shipments in any Contract Year, Licensor may terminate this Agreement by written notice delivered to Licensee within six (6) months after the end of the Contract Year in which Licensee failed to maintain such required Minimum Net Shipments.  Any such termination shall not affect Licensee's obligations to pay any outstanding indebtedness of Licensee to Licensor, nor any of the other obligations relating thereto.

NO.3      RETAIL STORE PROTECTION:  All free standing Hang Ten retail stores or department stores owned or operated or franchised by Licensor or its affiliates, located within the above granted Territories are excluded from the definition "Territory".

NO. 4       ADVERTISING RESTRICTIONS ON THE INTERNET:  Licensee specifically acknowledges and agrees that the right to utilize the trademarks on the Internet is hereby reserved to Licensor.

NO. 5       LIMITED EFFECT:  Nothing contained herein shall be construed or interpreted as a release or modification of the License Agreement or any provisions thereof, unless expressly stated herein, and, in such event, only to the extent expressly stated herein. Except as otherwise expressly modified hereby, all of the terms and conditions of the License Agreement shall remain in full force and effect.

NO. 6       TIME IS OF THE ESSENCE IN EXECUTION:  Licensee and Licensor acknowledge that time is of the essence with respect to the Licensee's execution and delivery to Licensor of this amendment to the License Agreement, which shall occur no later than April 20, 1999.

This amendment to the License Agreement shall have no force and effect unless and until signed by both Licensee and Licensor.

NO. 7       SUCCESSORS AND ASSIGNS:  This Amendment to the License Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

In witness whereof, the authorized officers of the parties hereto have executed this agreement as of the date set forth below.

**INTERNATIONAL LICENSING CORPORATION**
A Luxembourg corporation
   ("Licensor")

Dated    *April 29th, 1999.*

By    *Kmmung.*
     Kung Ging Kong, Dennis
     Director

**AZUREL LTD.**
A New York corporation
   ("Licensee")

Dated    *4/04/99*

By   
     Gerard Semhon
     Chief Executive Officer/Chairman

**EXHIBIT C**

# SECOND AMENDMENT TO HANG TEN LICENSE AGREEMENT

AZUREL LTD. ("Licensee") and INTERNATIONAL LICENSING CORPORATION ("Licensor") do hereby amend Licensee's Hang Ten License Agreement dated October 1, 1997 regarding the use of the words "Hang Ten" and associated trademarks in conjunction with certain products therein generally described as the "Licensed Items". The term "License Agreement" means and includes the initial License Agreement and all Amendments thereto. (All capitalized terms shall have the same meaning as in the License Agreement.)

All terms and provisions of the License Agreement, including the previous Amendment, shall remain the same and applicable to this Second Amendment, except as otherwise expressly set forth herein:

NO. 1        ADDITIONAL TERRITORY:  Effective August 1, 1999, the Territory as set forth in the License Agreement shall be amended to include the country of Japan.

NO. 2        TERM FOR ADDITIONAL TERRITORY:  The term for the named Additional Territory shall be for three (3) years and five (5) months, commencing as of August 1, 1999 and ending December 31, 2002 unless sooner terminated or extended pursuant hereto. Each period from January 1 through December 31 during the term hereof is hereafter referred to as "the (sequential) Contract Year", with the exception of the "First Contract Year" which shall be for the period of August 1, 1999 through December 31, 2000; for example, the period from January 1, 2001 through December 31, 2001 shall be referred to herein as the "Second Contract Year" and so forth.  (When the term "Contract Year" is used, it shall mean each of the First Contract Year, the Second Contract Year, and so forth).

Notwithstanding the foregoing, Licensor reserves the right to revoke this license for the Additional Territory at any time upon giving Licensee thirty (30) days written notice.  In no event shall the License for the Additional Territory survive past the term of the underlying License Agreement.

NO.3        ADVANCE DEPOSIT:        Licensee shall pay to Licensor US$10,000 upon signing by Licensee of this Second Amendment as an Advance Deposit to be applied against royalties due under Articles S.P. 9 and S.P. 10 during the First Contract Year. This contract shall not be valid until Licensor has received this Advance Deposit.

NO. 4        ROYALTIES:  Effective as of August 1, 1999 and continuing through the term of this Agreement including all extensions hereto, solely with reference to the Additional Territory herein granted, Article S.P. 6 of the underlying License Agreement is hereby amended to read as follows:

Licensee shall pay to Licensor as royalties for the rights granted hereunder the greater of the Minimum Royalty set out in Article No. 3 hereinbelow, or a sum equal to ten (10%) percent FOB US of Licensee's actual Net Shipments of Licensed Items, as "Net Shipments" is defined in Article G.P. 1 of the underlying License Agreement.  Such royalties shall be paid and accounted

for on a monthly basis in accordance with Article G.P. 3 of the Agreement.

NO.5        MINIMUM ROYALTY:   Licensee shall pay a Minimum Royalty to
Licensor for the Additional Territory as follows:

| | | |
|---|---|---|
| First Contract Year | (8/1/99-12/31/00) | $ 25,000 |
| Second Contract Year | (1/1/01-12/31/01) | $35,000 |
| Third Contract Year | (1/1/02-12/31/02) | $45,000 |

however, the Minimum Royalty for the Second Contract Year and each succeeding Contract
Year shall be the amount stated above, or 75% of the preceding Contract Year's actual Royalties
due, whichever is greater.

The above Minimum Royalties shall be due and payable on the 20th day of the month
following each Contract Year quarter at the rate of 25% per quarter for each of the respective
Contract Years. For purposes of this Agreement the first quarter of the First Contract Year shall
end March 31, 2000.  Licensee shall make such payments during the fourth quarter of the First
Contract Year to the extent that the Minimum Royalty exceeds any Advance Deposit made.  In
the event actual royalties paid monthly are less than the quarterly minimums set forth above,
Licensee will be responsible for the difference between actual royalties paid on Net Shipments
and the cumulative Minimum Royalties due.

NO. 6        MINIMUM NET SHIPMENTS:   The Minimum Net Shipments for the
Additional Territory shall be as follows:

| | | |
|---|---|---|
| First Contract Year | (8/1/99-12/31/00) | $250,000 |
| Second Contract Year | (1/1/01-12/31/01) | $350,000 |
| Third Contract Year | (1/1/02-12/31/02) | $450,000 |

however, the Minimum Net Shipments for the Second Contract Year and each succeeding
Contract Year shall be the amount stated above or 75% of the preceding Contract Year's actual
Net Shipments, whichever is greater.

If Licensee fails to maintain the required Minimum Net Shipments in any Contract Year,
Licensor may terminate this Agreement by written notice delivered to Licensee within six (6)
months after the end of the Contract Year in which Licensee failed to maintain such required
Minimum Net Shipments.  Any such termination shall not affect Licensee's obligations to pay
any outstanding indebtedness of Licensee to Licensor, nor any of the other obligations relating
thereto.

NO.7        ADVERTISING RESTRICTIONS ON THE INTERNET:   Licensee
specifically acknowledges and agrees that the right to utilize the trademarks on the Internet is
hereby reserved to Licensor.

NO. 8        LICENSEE'S MONTHLY REPORTS OF SHIPMENTS; ROYALTY
PAYMENT:  Sales of the Additional Territory shall not be applied toward the Minimum Royalty

and Minimum Net Shipment guarantees under the License Agreement. The Royalties and Net Shipments for the Additional Territory (pursuant to Articles S.P. 8 and S.P.9 of the License Agreement) shall be made, accounted for and shown separately, on Licensee's monthly report, from those of the other Licensed Items.

This amendment to the License Agreement shall have no force and effect unless and until signed by both Licensee and Licensor.

NO. 9        SUCCESSORS AND ASSIGNS:   This Amendment to the License Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

NO.10        RETAIL STORE PROTECTION:   All free standing Hang Ten retail stores or department stores owned or operated or franchised by Licensor or its affiliates, located within the above granted Territories are excluded from the definition "Territory".

NO.11        DISTRIBUTORS:  Prior to granting the distribution rights of the Licensed Items to a distributor in Japan, Azurel shall use its best efforts to have such distributor join the Hang Ten Japan Association and shall provide Sankyo Seiko Co. Ltd. with the chosen distributors' company name and contact information within a reasonable period of time after being appointed.

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/

In witness whereof, the authorized officers of the parties hereto have executed this agreement as of the date set forth below.

**INTERNATIONAL LICENSING CORPORATION**
A Luxembourg corporation
  ("Licensor")

Dated _____

By _____
    Samuel Chan
      Director

**AZUREL LTD.**
A New York corporation
    ("Licensee")

Dated _____

By _____
    Gerard Semhon
    Chief Executive Officer/Chairman

1

2

3

4

5

6

7

8      SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           FOR THE COUNTY OF SAN DIEGO

10

11   INTERNATIONAL LICENSING          ) Case No.: GIC 754174
     (CALIFORNIA) CORP., a California )
12   corporation,                     )
                                      ) STIPULATION TO EXTEND
13        Plaintiff,                  ) DEFENDANT'S TIME TO ANSWER
                                      ) COMPLAINT
14   vs.                             )
                                      ) Judge:    Hon. S. Charles
15   AZUREL LTD., a New York          )           Wickersham
     corporation,                     ) Dept:     73
16   and DOES 1-10, inclusive,        )
                                      )
17        Defendants.                 )
                                      )
18   _____)

19        IT IS HEREBY STIPULATED by and between Plaintiff, through its

20   attorney of record, Luce, Forward, Hamilton & Scripps LLP, and

21   Defendant, Azurel Ltd. that, pursuant to San Diego County Local

22   Rule 5.7, Defendant be granted a fifteen-day extension of time

23   within which to answer the Complaint to and including October 27,

24   2000.

25   / / /

26   / / /

27   / / /

28   / / /

_____
STIPULATION TO EXTEND DEFENDANT'S TIME TO ANSWER COMPLAINT

1    This continuance is requested to accommodate the Defendant

2  and to determine whether a resolution of this matter can be

3  obtained without the need for further litigation.

4  IT IS SO STIPULATED:

5  DATED: October 6, 2000          AZUREL LTD.

6

7                                  By: _Steven M. Barry_
                                        STEVEN M. BARRY

8                                  Its: _Corporate Secretary_

9  DATED: October 6, 2000          LUCE, FORWARD, HAMILTON & SCRIPPS LLP

10

11                                 By: _Callie A. Bjurstrom_

12                                     Callie A. Bjurstrom
                                       Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DUCKOR SPRADLING & ᴸ. ᴹᴇᴛZGER
401 West A Street, Suite 2400
San Diego, CA 92101-7915
(619) 231-3666

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTERNATIONAL LICENSING (CALIFORNIA) CORP., a California corporation, | ) ) ) |
| Plaintiff | ) ) |
| vs. | ) ) |
| AZUREL LTD., a New York corporation, and DOES 1-10, inclusive, | ) ) ) |
| Defendant | ) ) ) ) |

No. **'00 CV** 20 6 · L (R )

State Court No. GIC 754174

**DECLARATION OF SERVICE**

Person Served:

Callie A. Bjurstrom, Esq., Attorney for Plaintiff

Date Served:

October 11, 2000

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above-named person the following documents:

**NOTICE OF REMOVAL OF CIVIL ACTION [28 USCS §§ 1441, 1446; FRCP 81(c)]**

in the following manner:          (check one)

1) __XXX__          By personally delivering copies to the person served at the below-listed address on this date:

2) _____          By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid), copies to the person served at the place where the copies were left.

3) _____          By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4) _____          By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at San Diego, California, on _____, 19__.

**Callie A. Bjurstrom, Esq.**
**Luce, Forward, Hamilton & Scripps**
**600 West Broadway, Suite 2600**
**San Diego, California 92101**

Executed on October __11__, 2000, at San Diego, California.

mc 484
civ/crim 27 (5-82)

CSD-27

ORIGINAL

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of plea... or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I (a) PLAINTIFFS

INTERNATIONAL LICENSING (CALIFORNIA) CORP., a California corporation

## DEFENDANTS

FILED

AZUREL LTD., a New York corporation, and DOES 1-10, inclusive

00 OCT 11 PM 2: 24

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___
(IN U.S. PLAINTIFF CASES ONLY)
SOUTHERN DISTRICT OF CALIFORNIA
BY: ___ DEPUTY

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
CALLIE A. BJURSTROM, ESQ.
Luce, Forward, Hamilton & Scripps
600 West Broadway, Suite 2600
San Diego, CA 92101

**ATTORNEYS (IF KNOWN)**
JOHN C. WYNNE, ESQ.
Duckor Spradling & Metzger
401 West A Street, Suite 2400
San Diego, CA 92101

**00 CV 2036 L (RLB)**

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USCS Section 1441, 1446 & FRCP 81:C
Jurisdiction improper in California

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☒ Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☒ 2 Removal from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $75,000 in excess of

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See Instructions):

JUDGE ___ Docket Number ___

DATE 10/11/00

SIGNATURE OF ATTORNEY OF RECORD ___

#064785 $150.00 R.C.